**R. E. M. IV, INC., Respondent,**

v.

**ROBERT F. ACKERMANN & ASSOCIATES, INC., et al., Respondents,**

**Buhler Construction Company, Respondent,**

**Norcol, Inc., Appellant.**

No. 81–59.

Supreme Court of Minnesota.

Dec. 17, 1981.

Jardine Logan & O'Brien, John M. Kennedy, Jr., and Carol A. Hooten, St. Paul, for appellant.

Jesse & Cosgrove and Charles J. Noel, Minneapolis, for R.E.M. IV, Inc.

Briggs & Morgan and Margaret Savage, St. Paul, for Ackermann & Associates, Inc., et al.

Murnane, Conlin, White, Brandt & Hoffman and Lawrence R. King, St. Paul, for Buhler Const. Co.

SCOTT, Justice.

This is an appeal from an order of the Ramsey County District Court granting summary judgment, interpreting contractual language requiring subcontractor Norcol, Inc. (Norcol) to indemnify the general contractor Buhler Construction Company (Buhler), pursuant to the terms and conditions of a contract and to accept the defense of Buhler or to pay certain costs thereof. We reverse.

Plaintiff R.E.M. IV, Inc., (R.E.M.) brought the original action against the architect, Robert F. Ackermann & Associates, Inc. (Ackermann), the general contractor, Buhler, and the subcontractor, Norcol, for property damage and lost profits caused by the freezing and bursting of fittings on the sprinkler system in plaintiff's commercial buildings. In its complaint, R.E.M. alleges negligent design, construction, and installation of the sprinkler system. Each of the three defendants denied liability and brought cross-claims against the other defendants for contribution and indemnity. Buhler's motion for partial summary judgment against Norcol was granted, and Norcol appeals that order. R.E.M. and Acker-

mann take no part in this appeal since their interests are unaffected by the order.[1]

The Ackermann architectural firm designed two buildings for R.E.M. to be built in Fairmont, Minnesota, for use as homes for retarded and handicapped persons. The design provided for the construction and installation of a sprinkler system. On May 19, 1977, respondent Buhler, as general contractor, entered into a subcontract agreement with appellant Norcol to complete the sprinkler system for the sum of $12,905. The contract form used was the Associated General Contractors of Minnesota Standard Subcontract Agreement, 1974 edition. The two buildings were completed on December 1, 1977, and Norcol's work on the sprinkler system was accepted as complete on that date.

On December 7, 1977, water froze in the sprinkler system, bursting one of the tee fittings and causing water damage to R.E.M.'s building. On January 9, 1978, a second fitting burst, causing further damage. R.E.M. then brought this suit seeking $30,-000 in damages.

R.E.M.'s complaint alleges that the water loss was a result of the negligent acts of the defendants in the design and construction of the buildings and in the design, construction, and installation of the sprinkler system. In R.E.M.'s answer to interrogatories of Norcol, R.E.M. states the acts or omissions on which it bases its cause of action as follows: "The building was negligently and defectively designed and constructed in such a way that it allowed cold air to enter the building and freeze the pipes." According to R.E.M.'s answer to Norcol's interrogatories, R.E.M.'s expert will testify at trial that the fracture in the cast iron tee fitting "was apparently caused by an excessive internal pressure or force. A build up of ice within the fitting could have caused an increase in pressure sufficient to cause the fracture."

Whether there was any defect in the pipe fittings is disputed. R.E.M.'s expert states that the fracture in the cast iron tee fitting was not caused by a defect in the casting. In contrast, in statements Buhler obtained immediately after the water damage occurred, non-expert employees of R.E.M. expressed opinions that the tee appeared to be faulty, since there was pipe sealer inside the seam of the pipe.

Buhler tendered its own defense to Norcol, based on the following contractual indemnification provision in Subdivision 7 of the subcontract:

> The Subcontractor agrees to assume entire responsibility and liability for all damages or injury to all persons, whether employees or otherwise, and to all property, arising out of it, resulting from or in any manner connected with, the execution of the work provided for in this Subcontract * * * and the Subcontractor agrees to indemnify and save harmless the Contractor * * * from all such claims.

Norcol refused to accept the tender of defense, claiming that since the work of the subcontract, the installation of the sprinkler system, had been completed and accepted prior to the freezing of the pipes in the sprinkler, the indemnification requirement of Subdivision 7 was not applicable. Norcol interprets the contractual language "the execution of the work provided for in this Subcontract" to require indemnification only for damage occurring while the subcontract work is in progress, and contends that the strict construction rule prevents extension of the contractual indemnity to cover damage occurring after completion of the work.

The only question to be decided on this appeal is whether, under Subdivision 7 of the Associated General Contractors Standard Subcontract Agreement, the subcontractor is required to indemnify the general contractor for the latter's own negligence for property damage which occurred *after* the work of the subcontract was completed.

1. Since the order does not adjudicate all claims and rights of all the parties, it is nonappealable. However, due to the importance of the issue, we grant discretionary review under Rule 105.-03, Rules of Civil Appellate Procedure.

Subdivision 7 of the Associated General Contractors Standard Subcontract Agreement, under which the general contractor Buhler seeks indemnity from Norcol, contains the following language:

To obtain, maintain and pay for such workmen's compensation insurance as may be required by the General Contract or by law, comprehensive general liability insurance, comprehensive automobile liability insurance, protecting the Subcontractor against claims for bodily injury or death or for damage to property occurring upon, in or about the Project, with limits in amounts at least equal to the greater of those specified in the General Contract or those specified below:

\*  \*  \*  \*  \*  \*

*The Subcontractor agrees to assume entire responsibility and liability for all damages or injury to all persons*, whether employees or otherwise, *and to all property, arising out of it, resulting from or in any manner connected with, the execution of the work provided for in this Subcontract* or occurring or resulting from the use by the Subcontractor, his agents or employees, of materials, equipment, instrumentalities or other property, whether the same be owned by the Contractor, the Subcontractor or third parties, and the Subcontractor agrees to indemnify and save harmless the Contractor, his agents and employees from all such claims including, without limiting the generality of the foregoing, claims for which the Contractor may be or may be claimed to be, liable and legal fees and disbursements paid or incurred to enforce the provisions of this paragraph and the Subcontractor further agrees to obtain, maintain and pay for such general liability insurance coverage as will insure the provisions of this paragraph.

(Emphasis added.)

Determining the claims for which the subcontractor indemnifies, those claims for damages "arising out of \* \* \*, resulting from or in any manner connected with, the execution of the work provided for in this Subcontract," requires two separate determinations: (1) for whose negligent acts causing damage is indemnity promised? and (2) what is the scope of the area in which indemnity is available? This court, in a series of recent cases, has answered the first question by interpreting the indemnity language of Subdivision 7 to require that a subcontractor indemnify the general contractor even for damages caused by the general contractor's own negligence. *Johnson v. McGough Construction Co., Inc.*, 294 N.W.2d 286 (Minn.1980); *Jacobson v. Rauenhorst Corp.*, 301 Minn. 202, 221 N.W.2d 703 (1974); *Christy v. Menasha Corp.*, 297 Minn. 334, 211 N.W.2d 773 (1973). The trial court considered these decisions controlling in the instant case and required Norcol as subcontractor to indemnify the general contractor, Buhler.

These decisions are not determinative on the facts of this case, however, since they do not consider the second question, the scope of the indemnity. The subcontractor is obviously not responsible for all damage caused by the acts of the general contractor regardless of time or place. Only those damages and injuries "arising out of \* \* \*, resulting from or in any manner connected with, the execution of the work provided for in this Subcontract" are within the contractual indemnity. This issue of the scope of the indemnity was not addressed in *Johnson, Jacobson*, or *Christy*, since in each of those cases the indemnity provision was applied to claims for personal injuries that occurred during the actual performance of the work of the subcontract. The issue of first impression in this court, therefore, is whether the indemnity agreement also applies to damages and injuries which occur *after* the completion of the subcontractor's work.

Our consideration of this issue includes three aspects of the question. First, we consider the legal precedents requiring strict construction of indemnity agreements and requiring a causal relationship between the subcontractor's work and the damage. Next, we consider the language of the contract itself, the context in which the indemnity provision is found. Finally, we con-

sider the logical expectations of the parties in entering into such an agreement. Consideration of these aspects leads to our conclusion that the indemnity provision does not apply to damage which occurs after the completion of the subcontractor's work.

The strict construction rule for interpreting indemnity agreements was adopted in *Farmington Plumbing & Heating Co. v. Fischer Sand & Aggregate, Inc.*, 281 N.W.2d 838 (Minn.1979):

> Indemnity agreements are to be strictly construed when the indemnitee * * * seeks to be indemnified for its own negligence. There must be an express provision in the contract to indemnify the indemnitee for liability occasioned by its own negligence; such an obligation will not be found by implication.

*Id.* at 842. Norcol is therefore required to indemnify Buhler for damage that occurred after the subcontract work was completed only if the contract expressly provides for such indemnification.

We do not disagree with appellant's position that "execution of the work" is substantially equivalent to "the performance of the work." We used similar phrases as equivalent in *Johnson* where we paraphrased the contractual language "the execution of the work provided for in this Sub-Contract" by stating "performance of the subcontract." 294 N.W.2d at 287. This interpretation is not dispositive of the issue, however, since the indemnity provision covers damages *"arising out of * * *, resulting from or in any manner connected with,* the execution of the work" (emphasis added). Whether damage occurring after the completion of the work falls within the contractual language must still be considered.

In *Anstine v. Lake Darling Ranch*, 305 Minn. 243, 233 N.W.2d 723 (1975), we held that the contractual language in question required indemnification by the subcontractor "only where there is a temporal and geographical or a causal relationship between the subcontractor's work and the injury giving rise to the liability." 305 Minn. at 249, 233 N.W.2d at 727.[2] In that case, subcontractors who had entered into contracts with the general contractor on the entire construction project but were not working on the site at the time of the injury were held not liable under claims from the general contractor for indemnification.

Although aspects of *Anstine* that conflicted with the strict construction rule were expressly overruled in *Farmington Plumbing & Heating Co.*, 281 N.W.2d at 842 n.4, the requirement of a temporal and geographical or causal relationship remains intact. The statement in the trial court memorandum in the instant case that the court in *Johnson* rejected the requirement of a temporal and geographical or causal relationship is not accurate. In *Johnson* the court considered the *Anstine* requirement and found that the necessary causal relationship existed, since Johnson's injury occurred while Johnson was performing the work called for by the subcontract. 294 N.W.2d at 288.

In the case before us, however, the necessary causal relationship does not exist. There was no temporal and geographical relationship, since Norcol had completed its work prior to the time at which the damage occurred and was not even on the job site at the time of the damage. The damages that occurred are not sufficiently related to Norcol's on-the-job performance to meet the *Anstine* requirement.

Interpreting the indemnity language in the context of the entire paragraph in which it appears supports the conclusion that Norcol should not be required to indemnify Buhler. The concluding phrase of the sentence compelling indemnity requires the subcontractor "to obtain, maintain and

---

**2.** The indemnity provision interpreted in *Anstine* provided as follows:

> The Sub-Contractor agrees to assume entire responsibility and liability for all damages or injury to all persons, arising out of, resulting from or in any manner connected

with, the execution of the work provided for in this Sub-Contract * * *.

305 Minn. at 247, 233 N.W.2d at 726. The differences from the current standard form subcontract do not change the analysis.

pay for such general liability insurance coverage as will insure the provisions of this paragraph." The language does not require the subcontractor to obtain *completed operations* insurance which covers a different risk. The Appleman treatise on insurance explains the difference between the two types of coverage:

The comprehensive general liability policy provides protection to an insured, generally a contractor, under premises-operations coverage, who performs work at various locations but once such operation has been completed, as defined, it is excluded under the policy and if the insured requires liability protection from losses that may occur from its work product it then must carry *completed operations* coverage or else it is without protection.

7A J. Appleman, Insurance Law and Practice § 4508.03 (1979) (emphasis added).

This court distinguished general liability policies from completed operations policies in *Security Insurance Co. of Hartford v. Kaye Milling Supply, Inc.*, 297 Minn. 348, 211 N.W.2d 519 (1973), in which the issue was insurance coverage:

The policy obtained by Kaye is an ordinary liability policy which protects the contractor from claims arising out of injuries or damage negligently caused by the contractor in the course of construction. It is designed to cover such negligent conduct as that causing damage from falling beams and other objects such as tools, as well as damage from the collapse of any part of a structure which has not been completed or, if completed, has not been put to its intended use. This is a circumscribed exposure very different from that included in a policy which covers *completed operations*. Policies covering defective or improper workmanship on a completed operation which fails in its use involve a substantially greater risk. Such coverage is, in effect, one which insures against a breach of warranty. *The premiums for that risk are nearly double those for the limited hazards to which a contractor is exposed while the structure is in the process of*

*construction.* Equally significant is the necessity for a thorough investigation of the insured if completed coverage is to be afforded. Under such circumstances, the liability carrier must inquire into the contractor's ability to perform the work, his past experience, the length of time he has been in business, the competence of his employees and management, and the type of construction undertaken.

*Id.* at 353, 211 N.W.2d at 521–522 (emphasis added). The language in the indemnity provision requiring general liability insurance but not completed operations insurance suggests the intent of the drafters of the subcontract to require indemnity only while the work was in progress. Once the work of the subcontractor has been completed, the contractor is responsible for his own acts.

The subcontractor signing the standard form agreement drafted by the Associated General Contractors intends only to provide protection for the general contractor while the work of the subcontract is being performed, and certainly does not anticipate long term contractual liability for the general contractor's own negligence in the future after the subcontract is completed. The subcontractor does not intend to indemnify the contractor forever. Logic requires the conclusion that only damage occurring during the performance of the work of the subcontract is within the intended coverage of the indemnity provision.

Under the strict construction rule of *Farmington Plumbing & Heating Co.*, where the contractual language does not clearly express an intent to include liability for damage occurring through the negligence of the general contractor after the subcontract work is completed, the indemnity provision should not be enforced. If the subcontractor is to assume risks for acts not under his control, the subcontractor must be put on notice by clear and unambiguous language. This holding is equally applicable to the assumption-of-defense issue. The contractual provision requiring indemnity for damages "arising out of * * *, resulting

from or in any manner connected with, the execution of the work" of the subcontract should therefore not be interpreted to cover damages after the subcontract has been completed based upon the law, the contract ·itself, or logic.

Refusing to require indemnity does not mean appellant Norcol necessarily escapes liability. Norcol remains a party for the determination of direct liability for the damage. Subdivision 6 of the subcontract would then apply, which requires the subcontractor "[t]o save harmless the Contractor * * * from any and all losses or damage * * * occasioned by the failure of the Subcontractor to carry out the provisions of this Subcontract unless such failure results from causes beyond the control of the Subcontractor."

Reversed and remanded for trial.