**SPHERE DRAKE INSURANCE COMPANY, Plaintiff,**

**First Financial Insurance Company, Intervenor, Respondent,**

**v.**

**TREMCO, INC., Respondent (C2–93–1358), Appellant (C3–93–1367),**

**John Melich Company, Defendant (C2–93–1358), Respondent (C3–93–1367),**

**and**

**Walker Parking Consultants/Engineers, Inc., Appellant (C2–93–1358), Respondent (C3–93–1367).**

**SCOTTSDALE INSURANCE COMPANY, Defendant and Third–Party Plaintiff,**

**v.**

**CARLUND CORPORATION, Third–Party Defendant.**

**Nos. C2–93–1358, C3–93–1367.**

Court of Appeals of Minnesota.

March 1, 1994.

Review Denied April 28, 1994.

Michael J. Tomsche, Meagher & Geer, Minneapolis, for Sphere Drake Ins. Co.

Joseph F. Lulic, Michael M. Carter, Hanson, Lulic & Krall, Minneapolis, for First Financial Ins. Co.

John B. Lunseth, II, Louise A. Dovre, Rider, Bennett, Egan & Arundel, Minneapolis, for Tremco, Inc.

Thomas A. Pearson, Arthur, Chapman, McDonough, Kettering and Smetak, P.A., Minneapolis, for John Melich Co.

Jeffrey W. Coleman, Timothy R. Duncan, Coleman, Hull & Van Vliet, Minneapolis, for Walker Parking Consultants/Engineers, Inc.

Steven J. Muth, Gregory L. Wright, Stich, Angell, Kreidler & Muth, Minneapolis, for Scottsdale Ins. Co.

Considered and decided by CRIPPEN, P.J., and FORSBERG, and FOLEY, JJ.

## OPINION

FOLEY, Judge.

In this declaratory judgment action, the district court granted summary judgment in favor of the insurer of a subcontractor that performed work on a parking ramp restoration project. The district court concluded that the business risk doctrine precluded coverage for the claims against the subcontractor; that there had been no "occurrence" or "property damage," as those terms are defined in the policy; and that various policy exclusions applied. We reverse and remand for trial.

## FACTS

The present controversy arises out of the restoration of the LaSalle Court parking ramp, now known as the Conservatory ramp. The ramp was owned by Loop Parking Company. The restoration project, which required repair or replacement of the concrete on all levels of two ramp buildings, was designed by Lewis Ng of Walker Parking Consultants/Engineers, Inc. PAULCO was responsible for the removal and replacement of deteriorated concrete slabs. Another company, Cy–Con, was hired to perform the concrete repair work.

The Carlund Corporation and Loop Parking Company entered into a contract for the installation of a waterproofing system as part of the restoration of the parking ramp. Carlund subcontracted with John Melich Company for the waterblasting preliminary to application of a Tremco TBS–950 traffic-bearing waterproof membrane system at the ramp. Under the subcontract, Melich was to clean

the concrete parking deck and remove parking stall lines to prepare the ramp surface for application of the membrane coating.

The Tremco membrane was chosen by Carlund from a list of toppings approved by Walker Parking for use on the project. Tremco formulated the membrane system and sold the component parts to Carlund. Carlund was responsible for installation of the membrane; however, Tremco was required to have a field representative on site during installation. The field representative had the authority to stop the installation and order incorrect installation redone. While Carlund was performing its contract, PAULCO and Cy–Con were performing their repair and replacement of the concrete. Carlund had no authority over PAULCO and Cy–Con.

When installation of the Tremco membrane was completed, Carlund gave Tremco a two-year guarantee, under which Carlund agreed to repair the membrane system, at no cost to Tremco, for leakage or defective workmanship. Tremco issued a five-year guarantee to the ramp's owner, under which Tremco agreed to repair leaks caused by, among other things, faulty workmanship or materials used in the application of the Tremco membrane.

Carlund and Tremco performed isolated warranty repair work at the ramp in 1988 and 1989. In the spring of 1989, water leakage was observed on several areas of the ramp. At that time, delamination of the Tremco membrane was also detected. The ramp's owners notified Tremco of the problems with the membrane. Tremco then notified Carlund, requesting that Carlund perform the necessary repair work pursuant to the two-year guarantee Carlund gave Tremco. Carlund refused to perform further repairs, and Tremco hired Hapco Contractors, Inc. to perform the labor on the repairs. While conducting the repairs, Hapco's president observed damage to the ramp's concrete surface and reinforcement bars which, according to Hapco's president, was the result of Carlund's failure to properly rout, seal and

detail the joints. This failure allowed water and salt to penetrate the membrane and damage the concrete and reinforcement bars. The concrete and reinforcing bars were repaired at Tremco's expense.

Several possible causes of the membrane's failure have been identified. When the membrane was repaired, paint and dirt were found under it, indicating Melich did not adequately waterblast the surface before the membrane was installed. Tests of the membrane showed areas of inadequate thickness, for which Tremco blames Carlund's application of the membrane. Carlund has alleged that the primer Tremco provided was defective.

Tremco sued Carlund and Melich to recover the costs of investigation and repair of the damage to the ramp. Tremco alleged that Melich was negligent in failing to waterblast the concrete surface of the ramp properly, causing poor adhesion between the Tremco membrane and the ramp surface. Tremco alleged that Carlund failed to supervise Melich properly, failed to apply the Tremco membrane properly, and failed to detail cracks in the concrete before applying the Tremco membrane. Tremco's complaint alleged Melich and Carlund breached their implied warranties of good workmanship and fitness. Tremco also sought a declaration that it was entitled to indemnity from Carlund and Melich for claims for consequential damages which might be brought against Tremco. Thus far, no such claims have been brought.

Respondent First Financial Insurance Company (FFI) provided a manufacturer's and contractor's liability policy to Melich.[1] Although the subcontractor agreement between Melich and Carlund required Melich to name Carlund as an additional insured on its FFI policy, Melich did not do so. FFI was allowed to intervene in the litigation, and seeks a determination of FFI's duty to defend or indemnify Melich or Carlund for the claims brought by Tremco.

1. Plaintiff Sphere Drake Insurance Company and defendant and third-party plaintiff Scottsdale Insurance Company insured Carlund. After this appeal was filed, claims relating to the Sphere Drake and Scottsdale policies were settled. Only FFI's coverage is at issue in this appeal.

The FFI policy provided that the insurer would pay on behalf of the insured all sums the insured becomes legally obligated to pay as damages because of property damage to which the insurance applies, caused by an occurrence. In addition, the FFI policy contained exclusions for liability that the insured assumed contractually, for loss of use of tangible property that has not been physically damaged and for damage to work performed by the named insured.

FFI moved for summary judgment, alleging that the claims brought by Tremco came within the business risk doctrine, that there had been no occurrence resulting in property damage, and that policy exclusions barred coverage. The district court granted FFI's motion, concluding that the damages alleged were outside of the scope of the coverage afforded by the policy FFI issued to Melich. Tremco and Walker have appealed, and their appeals have been consolidated.[2]

### ISSUES

1. Did the district court err in concluding that the business risk doctrine precludes coverage from Tremco's claims?

2. Did the district court err in concluding there had been neither an "occurrence" nor "property damage" within the meaning of the FFI policy?

3. Does the FFI policy's exclusion of coverage for contractual assumption of liability preclude coverage for the claims of Tremco?

4. Does the work performed exclusion of FFI's policy preclude coverage for the claims brought by Tremco?

### ANALYSIS

■ Summary judgment is appropriate when there is no genuine issue as to any material fact and a party is entitled to a judgment as a matter of law. A material fact is one that will affect the result or the outcome of the case depending on its resolution. *Zappa v. Fahey*, 310 Minn. 555, 556, 245 N.W.2d 258, 259–60 (1976). A party opposing summary judgment cannot rely upon

general statements of fact, but must demonstrate that there are specific fact issues in existence which create a genuine issue for trial. *Moundsview Indep. Sch. Dist. No. 621 v. Buetow & Assocs.*, 253 N.W.2d 836, 838 (Minn.1977).

■ In reviewing a summary judgment, this court must determine whether there are any genuine issues of material fact and whether the district court correctly applied the law. *Offerdahl v. University of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988). The facts must be viewed in the light most favorable to the party against whom summary judgment was granted. *Grondahl v. Bulluck*, 318 N.W.2d 240, 242 (Minn.1982). Interpretation of an insurance policy presents a question of law that the district court can properly decide on a motion for summary judgment. On appeal, this court reviews the district court's conclusions of law de novo. *Grossman v. American Family Mut. Ins. Co.*, 461 N.W.2d 489, 493 (Minn.App.1990), *pet. for rev. denied* (Minn. Dec. 20, 1990).

### 1. *Business Risk*

There is no exclusion in the FFI policy setting forth the business risk doctrine. The "business risk" theory, however, is well understood in insurance law. Business risks

> are those risks which management can and should control or reduce to manageable proportions; risks which management cannot effectively avoid because of the nature of the business operations; and *risks which relate to the repair or replacement of faulty work or products*. These risks are a normal, foreseeable and expected incident of doing business and should be reflected in the price of the product or service rather than as a cost of insurance to be shared by others.

George H. Tinker, *Comprehensive General Liability Insurance–Prospective and Overview*, 25 Fed'n Ins. & Corp. Couns. Q. 217, 224 (1975) (emphasis added), *quoted in Knutson Constr. Co. v. St. Paul Fire & Marine*

---

**2.** FFI contends Tremco and Walker lack standing to bring this appeal because they were not the insureds under the policy. FFI's previous motion for dismissal of the appeal on this basis was denied, and we decline to reconsider the argument.

*Ins. Co.,* 396 N.W.2d 229, 235 (Minn.1986); *see also Bor–Son Bldg. Corp. v. Employers Commercial Union Ins. Co.,* 323 N.W.2d 58, 61–62 (Minn.1982). In *Bor–Son* and *Knutson,* general contractors were sued by owners for damage to buildings that resulted from poor workmanship and use of defective materials in their construction. The actual work was performed by subcontractors under the supervision of the general contractors. The *Bor–Son* and *Knutson* courts held that the claims against the general contractors were claims based on a failure to supervise the projects adequately, resulting in defective work by the subcontractors. In both cases, the Minnesota Supreme Court held that the damages alleged were the result of a breach of contract, a business risk that must be borne by a general contractor. As the court noted, when a construction contractor purchases a comprehensive general liability insurance policy,

> [t]he risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what the coverages in question are designed to protect against. The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.

*Bor–Son,* 323 N.W.2d at 63 (quoting Roger C. Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know,* 50 Neb.L.Rev. 415, 441 (1971)). The claims in *Bor–Son* and *Knutson* were based on the general contractors' failure to deliver products—completed buildings—to the owner that were free of defects.

This court later applied the business risk doctrine to a subcontractor's provision of defective workmanship and materials. *Ebenezer Soc'y v. Dryvit Sys.,* 453 N.W.2d 545 (Minn.App.1990). In *Ebenezer Soc'y,* a subcontractor furnished an external insulation and wall finish system on a construction project. Problems with water leakage developed, and the subcontractor's work was identified as a possible source of the problems. The building's owner and the subcontractor entered into a *Miller–Shugart* [3] settlement, and the building owner sought to recover from the subcontractor's liability insurers. *Ebenezer Soc'y,* 453 N.W.2d at 547.

In addition to the claims for damage to the building, the building's owner sought damages for lost rent, the cost of providing temporary living space for tenants displaced by the building's defects, the cost of moving and removal of furniture, and reinstallation of shades and draperies. *Ebenezer Soc'y,* 453 N.W.2d at 548. The building's owner also asserted it had been exposed to property damage claims by tenants. *Id.*

In finding the district court properly refused to allow the building owner to serve supplemental complaints in garnishment on the subcontractor's insurers, this court stated:

> To the extent [the owner] seeks damages for building and structural damage, there is clearly no coverage under the comprehensive general liability policies. * * * *A comprehensive general liability policy is intended to protect third parties* who suffer damage to person or property. * * * It is not intended to guarantee the insured's workmanship.

*Ebenezer Soc'y,* 453 N.W.2d at 548 (citations omitted) (emphasis added). The court went on to hold that there was no coverage for damage to third parties' property because the *Miller–Shugart* agreement did not apportion damages between covered and noncovered claims. *Ebenezer Soc'y,* 453 N.W.2d at 548–49.

---

3. *Miller v. Shugart,* 316 N.W.2d 729 (Minn.1982).

In *Ebenezer Soc'y,* the claims against the insured were breach of contract claims. *Id.* at 548. The claim that the building itself was damaged was based on the insured's negligent installation of a wall finish and insulation system that was supposed to keep water out. The failure of the system to keep water out was a breach of contract.

*Bor–Son, Knutson* and *Ebenezer Soc'y* must be contrasted with *Ohio Cas. Ins. Co. v. Terrace Enter.,* 260 N.W.2d 450 (Minn.1977). In *Terrace Enter.,* the insured was a construction contractor, Doerfler Construction Company, Inc., that undertook the construction of two 69-unit apartment buildings. Doerfler performed the excavation and carpentry work and hired subcontractors for the remaining work. Doerfler negligently performed the backfilling and foundation work; as a result, the building settled and threatened to collapse. The shell of the building had to be lifted on jacks and the foundation replaced. *Terrace Enter.,* 260 N.W.2d at 451–52.

The owner of the building, Terrace Enterprises, sued Doerfler, seeking to recover the expenses incurred in rectifying the faulty construction and losses occasioned by a three-month delay in opening the building for occupancy. The district court required Doerfler's general liability insurer to defend, and the Minnesota Supreme Court affirmed on appeal.

In affirming, the court in *Terrace Enter.* did not address the business risk doctrine. First, the court determined that the faulty construction of the apartment building was an "occurrence." Second, the court determined that an exclusion for property damage to property in the care, custody or control of the insured did not preclude coverage because the building was not in the care, custody or control of Doerfler Construction during construction. The court also concluded that an exclusion for property damage to work performed by or on behalf of the named insured did not exclude coverage, because the entire building was not Doerfler's product. In reaching this conclusion, the court in *Terrace Enter.* relied on *Hauenstein v. St. Paul–Mercury Indem. Co.,* 242 Minn. 354, 65 N.W.2d 122 (1954), a case applying a pre-

1966 comprehensive general liability policy. *Hauenstein* was distinguished on this basis in *Federated Mut. Ins. Co. v. Concrete Units,* 363 N.W.2d 751, 756 (Minn.1985). Finally, the court in *Terrace Enter.* concluded that an exclusion for damages claimed for the withdrawal of the named insured's products from the market did not apply.

█ Applying these cases to this case, we make the following conclusions. The cost of redoing Melich's defective work (that is, to clean the concrete parking decks and remove parking stall lines) is excluded from coverage by the business risk doctrine. *Bor–Son,* 323 N.W.2d at 64.

█ The cost of repairing damage to the ramp and the Tremco membrane that resulted from Melich's alleged defective work, however, is *not* excluded from coverage by the business risk doctrine. When the insured's faulty workmanship results in damage to the property of a third party—in this case, Tremco and the ramp's owner—such third-party property damage is not excluded from coverage by the business risk doctrine. *Id.* (quoting *Weedo v. Stone–E–Brick, Inc.,* 81 N.J. 233, 405 A.2d 788, 791 (1979)). The property damage to Tremco is the cost of repairing the ramp.

█ Tremco and Walker argue that the *Bor–Son* and *Knutson* decisions do not apply to this case because Carlund and Melich did not exercise complete control over the entire construction project. In *Bor–Son* and *Knutson,* the insureds' product was the completed building that the insured agreed to build. The insured in each case had sufficient control over the entire construction project to make the entire building the named insured's responsibility. In the present case, the named insured provided waterblasting services as a component part of a much larger project. The insured can be held responsible only for risks within the named insured's control. *See Terrace Enter.,* 260 N.W.2d at 454; *T.E. Ibberson Co. v. American & Foreign Ins. Co.,* 346 N.W.2d 659, 662 (Minn. App.1984). In granting summary judgment, the district court did not address the control issue.

Here, the facts indicate varying levels of control over different elements of the renovation project. Melich was responsible for waterblasting. Carlund was responsible for applying the Tremco membrane, but Tremco had the authority to stop Carlund's work and have incorrect application redone. Meanwhile, PAULCO and Cy–Con were performing their work, which occasionally interfered with application of the Tremco membrane. There is testimony in the record that PAULCO placed materials on the membrane during the renovation. Carlund had no authority over PAULCO or Cy–Con; neither, apparently, did Tremco or Melich.

As the court noted in *Knutson,* when a general contractor, having exercised control and supervision over all aspects of the construction of a building, turns the completed building over to the owner, the general contractor must accept the risk that the building will not meet contract specifications. Coverage under the general contractor's liability insurance policy will not cover a claim by the owner that the building is defective. The general contractor may, however, have a cause of action against subcontractors. *Knutson,* 396 N.W.2d at 237 n. 13.[4] That is the situation this case presents: a claim has been brought by the contractor responsible for installation of a waterproofing system against subcontractors. This is not a case involving a claim by a building owner that a general contractor has provided a defective building.

To the extent Tremco seeks the cost of redoing the work performed by Melich, these are the types of claims covered by a performance bond.[5] *See Ebenezer,* 453 N.W.2d at 549. They are not the type of claims against which a liability insurance policy provides coverage. To the extent the claims against Melich are for repairing damage to the ramp caused by defective work, however, the claims are not excluded.

### 2. *Occurrence and Property Damage*

The FFI policy defines "occurrence" as

an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

This definition requires that there be (1) an accident; (2) that results in property damage; (3) that is neither expected nor intended by the insured. *Bituminous Cas. Corp. v. Bartlett,* 307 Minn. 72, 77, 240 N.W.2d 310, 312 (1976), *overruled in part on other grounds, Prahm v. Rupp Constr.,* 277 N.W.2d 389, 391 (Minn.1979).

FFI contends that there was no accident because any damage resulting from Melich's failure to clean the ramp deck properly was "not only foreseeable, but highly probable." FFI, however, is proceeding on the assumption that Melich, in fact, failed to perform its duties in a workmanlike manner and that this was the cause of the damage to the ramp. The cause of the Tremco membrane's failure is very much in dispute. There are allegations that Melich failed to properly clean the concrete deck. There are allegations that Carlund failed to apply the membrane properly. Carlund contends the primer, a component of the membrane solely within Tremco's control, was defective. The cause of the Tremco membrane's failure presents a question of fact that should not be decided on a motion for summary judgment. Even if Melich failed to clean the parking deck properly, the question remains whether that failure was negligent or reckless. *See Terrace Enter.,* 260 N.W.2d at 453; *Farmers Union Oil Co. v. Mutual Serv. Ins. Co.,* 422 N.W.2d 530, 533 (Minn.App.1988) (reckless conduct bars insurance coverage under intentional acts exclusion). The issues of fact regarding negligence, causation, comparative fault and dam-

---

**4.** The court in *Knutson* stated:
> Of course, the general contractor may have a remedy for contribution, indemnity or otherwise against subcontractors who breached contracts.

396 N.W.2d at 237 n. 13. Although *Knutson* speaks only of a general contractor's remedies

against subcontractors, there is no reason to believe the rule is different with respect to a subcontractor's remedies against other subcontractors.

**5.** There are no issues in this case, however, involving a performance bond.

ages that are present in this case should be determined by a jury.

 FFI also argues that there has been no "property damage" within the meaning of its policy. The policy defines property damage as "physical injury to or destruction of tangible property" and includes the loss of use of the property. Tremco did not allege that *it* had suffered a loss of use of the ramp.[6]

Tremco has, however, sought to recover the cost of repairs to the ramp caused by the failure of the membrane. The failure of the membrane allowed water and salt to damage both the concrete and the reinforcing rods, necessitating expensive repairs, for which Tremco paid. This is not simply a claim for replacement costs resulting from defective work and materials. The damage to the ramp itself constitutes "property damage" within the meaning of FFI's policy. *See Terrace Enter.*, 260 N.W.2d at 452–53; *Thermex Corp. v. Fireman's Fund Ins. Cos.*, 393 N.W.2d 15, 17 (Minn.App.1986); *Concrete Units*, 363 N.W.2d at 756–57. The defective waterblasting also allegedly damaged the Tremco membrane. This is also property damage.

### 3. *Contractual Liability*

 The FFI policy excludes coverage for "liability assumed by the insured under any contract or agreement except an incidental contract." This exclusion[7] applies to liability the insured would not have had in the absence of a contractual assumption of liability. *See American Cas. Co. v. Timmons*, 352 F.2d 563, 568 (6th Cir.1965); *Home Ins. Co. v. Southport Terminals*, 240 So.2d 525 (Fla. App.1970). As the Florida Court of Appeals stated in *Southport Terminals,*

the policy does not protect Southport against "liability *assumed* by the insured

under any contract or agreement except" certain common but irrelevant hold-harmless agreements. What this means is debatable. It is at least arguable that it means that the insurance company is not liable to an insured which gratuitously undertakes to act as surety or which undertakes contractual obligations not arising as a matter of law in the conduct of its business.

*Southport Terminals,* 240 So.2d at 525 (emphasis in original). The claims brought by Tremco for contribution for the cost of repairs are claims that could have been brought in the absence of any contract.

 The parties argue over the applicability of the exception to the exclusion for a warranty that the insured's work will be performed in a workmanlike manner. The language of the exception limits its application to "bodily injury or property damage occurring while work performed by the named insured is in progress." Tremco has not sued Melich and Carlund for property damage occurring while their work was in progress.

Tremco cites North Dakota case law in support of its argument that the exception to the exclusion constitutes a grant of coverage for breach of warranty. The North Dakota Supreme Court has acknowledged that its construction of the contractual liability exclusions exception is contrary to the Minnesota Supreme Court's *Knutson* and *Bor–Son* decisions. *See Vigen Constr. Co. v. Millers Nat'l Ins. Co.*, 436 N.W.2d 254, 256 (N.D.1989).

There has been no assumption of liability that would not have existed in the absence of any contractual assumption of liability. The exclusion is inapplicable.

### 4. *Work Performed*

The FFI policy contains an exclusion for

---

**6.** For this reason, we reject FFI's argument that a policy exclusion for "loss of use of tangible property which has not been physically injured" applies. Tremco has not asserted a claim for loss of use, and the ramp has been physically injured.

**7.** The exclusion reads:

This insurance does not apply

(a) to liability assumed by the insured under any contract or agreement except an incidental contract; but with respect to bodily injury or property damage occurring while work performed by the named insured is in progress, *this exclusion does not apply to a warranty that such work will be done in a workmanlike manner.*

(Emphasis added.)

property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith.

This exclusion bars coverage for damage to the insured's own work, but not damage to other property, such as the ramp and the Tremco membrane. *See United States Fidelity & Guar. Co. v. Bonitz Insulation Co.,* 424 So.2d 569 (Ala.1982); *Old Republic Ins. Co. v. Sheridan,* 407 So.2d 619 (Fla.App. 1981); *American States Ins. Co. v. Villegas,* 394 So.2d 222 (Fla.App.1981); *Adler & Nielson Co. v. Insurance Co. of North Am.,* 56 N.Y.2d 540, 449 N.Y.S.2d 957, 434 N.E.2d 1335 (1982).

In the district court and on appeal, Tremco and Walker relied on *Olympic Steamship Co. v. Centennial Ins. Co.,* 117 Wash.2d 37, 811 P.2d 673 (1991). The court in *Olympic Steamship* defined the term "insured's product" for purposes of a sistership exclusion, which bars coverage for the costs associated with recalling a line of products when a defect in the product is known or suspected.

The present case does not involve a sistership exclusion or the term "insured's product." *Olympic Steamship* is inapplicable. The work performed by Melich was waterblasting. There has been no allegation of property damage to the waterblasting work performed by Melich, and the exclusion does not apply.

### DECISION

The damage claimed is for property damage to third parties, including Tremco and the ramp's owners; thus, coverage for the claims is not precluded by the business risk doctrine. There are fact issues regarding whether there was an occurrence as that term is used in the FFI policy. The exclusions on which FFI relies do not bar coverage on the facts of this case.

**Reversed and remanded for trial.**