SEWARD HOUSING CORPORATION,
Plaintiff,

v.

CONROY BROTHERS COMPANY,
et al., Defendants,

and

CONROY BROTHERS COMPANY, third-party plaintiff, Respondent,

v.

RIGHT–WAY CAULKING, third-party defendant, Appellant,

Dow Chemical Company d/b/a/ Dow Chemical U.S.A., a Delaware Corporation, third-party defendant, Respondent,

Keene Corporation, a New York Corporation, Third–Party Defendant.

No. C7–96–351.

Supreme Court of Minnesota.

Jan. 22, 1998.

Dale B.Lindman, Victor E. Lund, Mahoney, Dougherty and Mahoney, P.A., Minneapolis, for Appellant.

Lauris A. Heyerdahl, Jerome B. Abrams, Abrams & Smith, Minneapolis, for Respondent.

## OPINION

BLATZ, Justice.

This appeal concerns issues arising out of a subcontract agreement between Conroy Brothers Company and its subcontractor, Right–Way Caulking. The Hennepin County District Court denied Conroy Brothers' motion for summary judgment and dismissed its third-party claim for indemnification against Right–Way. Upon petition of Right–Way, we review the court of appeals decision, which affirmed the district court in part, but remanded the case for a factual determination of whether Right–Way's work on the project was the cause of the underlying damages. We reverse and reinstate the judgment of dismissal.

In the spring of 1984, the owners of a low-income housing apartment building, now known as Seward Towers West, contracted with Conroy Brothers to install a new exterior wall system for the building. On September 27, 1984, Conroy subcontracted with Right–Way to provide caulking, sealing, and other services in connection with the installation of the wall system. Right–Way worked on the project in November and December 1984, in June through December 1985, and for two days in 1986. May 4, 1986, was the last day Right–Way employees performed any work on the project.

Seward Housing Corp. (Seward) purchased Seward Towers West in 1990. Cracks in the exterior wall installed by Conroy Brothers appeared as early as November 1987, but Seward maintained that these cracks were merely hairline cosmetic cracks that did not allow any water infiltration. In April 1993, however, a large chunk of the exterior wall fell to the ground. Seward subsequently commenced an action against Conroy Brothers, among others, alleging negligence in the construction of the wall system. Seward never asserted a claim against Right–Way. Conroy Brothers, in turn, brought a third-party claim against Right–Way and other subcontractors.

Subsequently, Seward and Conroy Brothers entered into a *Pierringer* release, whereby Conroy Brothers paid Seward $400,000. Conroy Brothers, relying on a provision in the subcontract that required Right–Way to obtain a liability insurance coverage policy, moved for summary judgment against Right–Way for indemnification in the amount of $250,000. This amount represents the property damage limit of the liability insurance policy Right–Way contracted to procure. It is undisputed that Right–Way never purchased such a policy. However, the district court concluded that the subcontract required Right–Way to purchase general liability insurance and that, even if purchased, general liability insurance would not have covered the damages alleged in this case. Accordingly, the district court denied Conroy Brothers' motion for summary judgment and dismissed its claim against Right–Way.

The court of appeals concluded that Right–Way is liable only for damages directly connected with its work on the subcontract. The court of appeals stated that if the damages were due to the negligence of another subcontractor, then Conroy Brothers is not entitled to indemnification from Right–Way. Thus, the court of appeals' remand required a factual determination of whether Right–Way's work on the project resulted in the underlying damages. On appeal, this court reviews whether Conroy Brothers' claim for indemnification falls within the coverage of the liability insurance that Right–Way contracted to purchase.

■ The relevant language in the subcontract agreement between Conroy Brothers and Right–Way provides:

> The Sub–Contractor agrees to assume entire responsibility and liability for all damages or injury to all persons, whether employees or otherwise, and to all property, arising out of, resulting from or in any manner connected with, the execution of the work provided for in this Sub–Contract or occurring or resulting from the use by the Sub–Contractor, his agents or employees, of materials, equipment, instrumentalities or other property, whether the same be owned by the Contractor, the Sub–Contractor or third parties, and the Sub–Contractor agrees to indemnify and save harmless the Contractor, his agents and employees from all such claims including, without limiting the generality of the foregoing, claims for which the Contractor may be, or may be claimed to be, liable, and legal fees and disbursements paid or incurred to enforce the provisions of this paragraph, and the Sub–Contractor further agrees to obtain, maintain and pay for such general liability insurance coverage as will insure the provisions of this paragraph.

■ This indemnity language tracks the language of the Association of General Contractors of Minnesota (AGC) standard subcontract. Previously, this court analyzed identical language set forth in an AGC subcontract and concluded that the language "necessarily includes claims of the contractor's negligence." *Johnson v. McGough Constr. Co.*, 294 N.W.2d 286, 288 (Minn. 1980). Thus, the scope of the indemnity language in the instant case includes damages resulting from Conroy Brothers' negligence, a fact that neither party disputes.[1]

Until 1984, construction contracts that indemnified the indemnitee for claims arising out of its own negligence were upheld by this court, provided that the agreements expressed an unequivocal intent to indemnify for damages resulting from the indemnitee's own negligence. *See Farmington Plumbing & Heating Co. v. Fischer Sand & Aggregate, Inc.*, 281 N.W.2d 838, 842 (Minn.1979).

■ In 1983, however, the legislature enacted a statute that limits the enforceability of indemnification agreements in building and construction contracts executed on or after May 1, 1984. Currently, the statute provides that indemnification agreements are:

> unenforceable except to the extent that the underlying injury or damage is attributable to the negligent or otherwise wrongful act or omission, including breach of a specific contractual duty, of the promisor or the promisor's independent contractors, agents, employees, or delegatees.

Minn.Stat. § 337.02 (1996). Thus, no party can be indemnified when its own negligent acts or omissions are the underlying cause of the injury or damages. This restriction ensures that each party remains responsible for its own negligent actions.

Although the legislature clearly expressed its disapproval of indemnification agreements in construction contracts where one party undertakes to indemnify a second party for damages attributable to the second party's fault, it carved out a narrow exception from this general prohibition, allowing parties to provide specific insurance coverage "for the benefit of others." Minn.Stat. § 337.05, subd. 1 (1996).[2] Section 337.05, subd. 2, further provides that if:

> (a) a promisor agrees to provide specific types and limits of insurance; and

> (b) a claim arises within the scope of the specified insurance; and

---

1. The court of appeals' determination that the subcontract only required Right–Way to purchase insurance that indemnifies Conroy for damages directly caused by Right–Way is erroneous. The subcontract language includes claims resulting from Conroy Brothers' negligence.

2. Subsequently, this court has applied § 337.05 to a provision of a standard subcontract agreement requiring the subcontractor to purchase liability insurance to cover any negligent acts by the promisee and concluded that such a provision was an enforceable promise to provide specific insurance coverage for the benefit of others, rather than an unenforceable indemnification agreement. *Holmes v. Watson–Forsberg Co.*, 488 N.W.2d 473, 475 (Minn.1992).

(c) the promisor did not obtain and keep in force the specified insurance;

then, as to that claim and regardless of section 337.02, the promisee shall have indemnification from the promisor to the same extent as the specified insurance.

Minn.Stat. § 337.05, subd. 2 (1996).

In this case, it is undisputed that Right–Way contracted to obtain a liability insurance policy and failed to do so. The only issue before this court is whether the disputed claim "arises within the scope of the specified insurance." If so, Conroy Brothers is entitled to $250,000, the limit of the policy Right–Way was required to obtain.

While Conroy Brothers argues that it is difficult to determine what the scope of the specified insurance would include, since no such policy exists, the language of the subcontract itself defines the nature of the insurance Right–Way was obligated to provide. *See R.E.M. IV, Inc. v. Robert F. Ackermann & Assoc., Inc.*, 313 N.W.2d 431, 434–35 (Minn.1981) (interpreting language identical to the indemnity provision at issue and determining that the language only required the subcontractor to obtain a general liability insurance policy, not a completed operations policy).[3]

The *Ackermann* court distinguished a general liability insurance policy from a completed operations policy, referring to its earlier decision in *Security Insurance Co. v. Kaye Milling Supply, Inc.*, 297 Minn. 348, 353, 211 N.W.2d 519, 521–22 (1973). *Id.* at 435. In *Kaye Milling*, this court observed that a general liability policy

protects the contractor from claims arising out of injuries or damage negligently caused by the contractor in the course of construction. It is designed to cover such negligent conduct as that causing damage from falling beams and other objects such as tools, as well as damage from the collapse of any part of a structure which has

not been completed or, if completed, has not been put to its intended use. This is a circumscribed exposure very different from that included in a policy which covers completed operations. Policies covering defective or improper workmanship on a completed operation which fails in its use involve a substantially greater risk. Such coverage is, in effect, one which insures against a breach of warranty.

*Kaye Milling,* 297 Minn. at 353, 211 N.W.2d at 521–22.

After concluding that the language in the indemnity provision required the subcontractor to purchase general liability insurance, not completed operations insurance, *Ackermann* reasoned that this suggested "the intent of the drafters of the subcontract to require indemnity only while the work was in progress. * * * Logic requires the conclusion that only damage occurring during the performance of the work of the subcontract is within the intended coverage of the indemnity provision." *Ackermann,* 313 N.W.2d at 435.

The *Ackermann* court further concluded that indemnification was required "only where there is a temporal and geographical or a causal relationship between the subcontractor's work and the injury giving rise to the liability." *Id.* at 434 (quoting *Anstine v. Lake Darling Ranch,* 305 Minn. 243, 249, 233 N.W.2d 723, 727 (1975)). Because the subcontractor in *Ackermann* had completed its work before the damage occurred, the required temporal and geographical relationship was not present. *Id.* Likewise, in the present case, Right–Way had completed its work at least a year before arguably the earliest damage was documented.

Further guidance on the distinction between the two types of coverage can be found in Appleman's treatise on insurance law,

---

3.  Notwithstanding the distinction between general liability and completed operations coverage, Conroy Brothers cites three cases for the proposition that there would be coverage under the general liability policy Right–Way was required to purchase, even though the damages did not occur until after the work of the subcontractor was completed. *See Federated Mut. Ins. Co. v.*

*Concrete Units, Inc.,* 363 N.W.2d 751, 757 (Minn. 1985); *Sphere Drake Ins. Co. v. Tremco, Inc.,* 513 N.W.2d 473, 481 (Minn.App.1994); and *Ebenezer Society v. Dryvit Systems, Inc.,* 453 N.W.2d 545, 547 (Minn.App.1990). However, these cases are inapposite and unrelated to this issue of the scope of this contractual indemnity.

which this court cited with approval in *Ackermann:*

> The comprehensive general liability policy provides protection to an insured, generally a contractor, under premise-operations coverage, who performs work at various locations but once such operation has been completed, as defined, it is excluded under the policy and if the insured requires liability protection from losses that may occur from its work product it then must carry completed operations coverage or else it is without protection.

7A John A. Appleman, Insurance Law and Practice § 4508.03 (1979).[4]  *See Ackermann,* 313 N.W.2d at 435.

■ We conclude that even if Right–Way had purchased the required general liability insurance, the policy would not have provided coverage for the damages Conroy alleges. A general liability insurance policy provides coverage only for losses occurring during the performance of the work of the subcontract. Looking at the evidence in its most favorable light to Conroy, the property damage did not occur until at least a year after any Right–Way employees worked on the construction project, and any claims asserted in this regard would fall within completed operations coverage not contemplated by the subcontract. The decision of the court of appeals is reversed, and the order of the district court dismissing Conroy Brothers' third-party claim against Right–Way is reinstated.

Reversed and judgment of dismissal reinstated.

---

**4.** *See also* 11 George J. Couch, Couch on Insurance, § 44:351 (2d ed. 1959) ("When the specified operations cease, it follows by hypothesis that coverage ceases and that harm thereafter is not within the coverage of the operations policy."); 46 C.J.S. Insurance § 973 (1993) ("A completed operations hazard endorsement insurance policy insures the contractor against accidents which might occur during the policy period but after the completion of the project, at which point the general liability insurance no longer provides coverage.").